UNITED STATES DISTRICT COURT FILED OFFICE
FOR THE DISTRICT OF MASSACHUSETTS

2011 DEC 19 P 4: 18

Vigilant Insurance Co., New England Homes for the Deaf, Providence Mutual
Insurance Co., as subrogee for Jeffrey Boyer, Mary LeClerc, and Brian Norris,
Triangle, Inc., Commonwealth of Massachusetts, Ryan Oak, Djalma Santos,
Arthur Siasios, Siasos Water Street Building, LLC, Safeco Insurance Co., as
subrogee for Craney Self-Storage, Horace Mann Insurance Co., as subrogee for
John Ward, Stephen L. Louf, Jr., Nautilus Insurance Co., as subrogee for
McWilliams Woodworking, Michael J. Listro, Elizabeth M. Listro, Kenneth
Maiocco, Rachelle Borelli, Paul Ristuccia, Edward Bibeault, Michael Begonis,
Wayne Begonis, Diane Dabose, Joshua Drennan, Nancy Ferreira, Fox Hill
School, Holly Gould, Mark Johnson, Frank Knox, John Lantych, Katherine
Lantych, Donald Merryman, Kenneth Newton, Victoria Newton, Armindo
Romano, Christina Romano, Anne Marie Ruotolo, Darrell Sanders, Patti
Sanders, Louis Scoglio, Robert Surawski, Kathryn Surawski, Dana Swanstrom,
Alexander Terista, Alfonso Totilo, and Darren Murray,

     Plaintiffs,

v.

ASHLAND, INC., (d/b/a Ashland Chemical Company, d/b/a Ashland Specialty
Chemical Company, d/b/a Ashland Distribution Company),

     Defendant,

## COMPLAINT

## AND

## DEMAND FOR JURY TRIAL

{00026960.DOCX ; 1}

## I.    NATURE OF ACTION

1.    This is an action against Ashland, Inc. (d/b/a Ashland Chemical Company, d/b/a Ashland Specialty Chemical Company, d/b/a Ashland Distribution Company) (hereinafter, "Ashland") seeking a recovery against Ashland for the injury and damage caused the Plaintiffs that arises out of Ashland's conduct in causing, in the early morning of November 22, 2006, a high order vapor cloud explosion (VCE) at CAI's Danversport, Massachusetts plant that devastated the community (the "Explosion"). Plaintiffs' claims against Ashland are for strict liability, negligence, public nuisance, breach of implied warranty of merchantability, and violations of M.G.L. Chapter 93A. Plaintiffs' action does not seek a recovery from CAI or for any claims "arising out of" CAI's "use, storage, handling or resale of the Product."* Plaintiffs seek a recovery from Ashland solely to the extent of Ashland's own conduct.

2.    The following is apparent from the face of this Complaint: 1) CAI and Plaintiffs have settled any claims that Plaintiffs had arising out of CAI's conduct in causing the Explosion; 2) any alleged indemnification of Ashland by CAI is expressly limited to "claims arising out of [CAI's] *use, storage, handling or resale of the Product*"; and 3) Plaintiffs' action against Ashland is by its terms expressly limited only to a recovery from Ashland for claims solely arising out of its own conduct. For these reasons, in the interest of the prompt, fair, and efficient resolution of this action, Plaintiffs seek a threshold determination by the Court that Ashland is

---

*    The "indemnity" language at issue appears on the back of Ashland's invoices for the chemicals involved in the Explosion. The statement on the back of the invoices states:

> BUYER agrees to defend, indemnify and hold SELLER harmless against claims by any third party (including BUYER's employees and customers) *arising out of BUYER's use, storage, handling or resale of the Product.*

Ashland Invoices at **Exhibit A** attached (emphasis added) and described at par. 24 below.

not entitled to recover from CAI under the purported indemnity or contribution at issue for the claims being asserted by the Plaintiffs in this action and therefore there is no basis for a third party claim by Ashland against CAI for indemnity or contribution.

## II.   JURISDICTION AND VENUE

3.   This Court has Diversity and Supplemental Jurisdiction over this multi-plaintiff action pursuant to 28 U.S.C. 1332(a) and 1367(a). A substantial number of the Plaintiffs' claims exceed $75,000.00. The action involves common questions of law and fact and the parties have joined their claims together in one action as allowed under FRCP Rule 20.

4.   Venue is appropriate in this Court because Ashland conducted substantial business in this District, and sold, supplied, combined and maintained large volumes of the chemicals that caused the subject Explosion at the Danvers facility in this District.

## III.   PARTIES

5.   **Plaintiffs**

Plaintiffs Vigilant Insurance Co., New England Homes for the Deaf, Providence Mutual Insurance Co., as subrogee for Jeffrey Boyer, Mary LeClerc, and Brian Norris, Triangle, Inc., Commonwealth of Massachusetts, Ryan Oak, Djalma Santos, Arthur Siasios, Siasos Water Street Building, LLC, Safeco Insurance Co., as subrogee for Craney Self-Storage, Horace Mann Insurance Co., as subrogee for John Ward, Stephen L. Louf, Jr., Nautilus Insurance Co., as subrogee for McWilliams Woodworking, Michael J. Listro, Elizabeth M. Listro, Kenneth Maiocco, Rachelle Borelli, Paul Ristuccia, Edward Bibeault, Michael Begonis, Wayne Begonis, Diane Dabose, Joshua Drennan, Nancy Ferreira, Fox Hill School, Holly Gould, Mark Johnson, Frank Knox, John Lantych, Katherine Lantych, Donald Merryman, Kenneth Newton, Victoria Newton, Armindo Romano, Christina Romano, Anne Marie Ruotolo, Darrell Sanders, Patti Sanders, Louis Scoglio, Robert Surawski, Kathryn Surawski, Dana Swanstrom, Alexander

Terista, Alfonso Totilo, and Darren Murray, are various persons and entities who were injured or damaged by the Explosion.   The Plaintiffs cumulatively sustained injuries and damages in the millions of dollars. A substantial number of the Plaintiffs individually sustained injuries and damages well in excess of $75,000.00.

      6.    **Defendant**

Defendant Ashland is a Kentucky corporation having its principal place of business located at 50 E. River Center Boulevard, Covington, KY 41012, and maintaining Massachusetts operations at 400 Main Street, Tewksbury, MA 01876.

## IV.   ASHLAND'S CONDUCT IN CAUSING THE EXPLOSION

      7.    Ashland continuously and systematically over a period of several years, sold, supplied, delivered, combined, and maintained large quantities of volatile and explosive solvents including Heptane and solvent  mixtures  including Heptane and Iso Propyl and n –Propyl alcohol ("Chemicals") for CAI, Inc. ("CAI") a manufacturer of commercial printing inks and Arnel Co., Inc. ("Arnel") a manufacturer of paint products, each operating from the 126 Water Street, Danvers, Massachusetts facility that was the site of the Explosion ("Danvers facility" or "the facility").

      8.    Ashland is an international chemical manufacturer and supplier.  Beginning several years prior to the Explosion and continuing through the time of the Explosion, Ashland was the primary provider of Chemicals to CAI and Arnel. At all relevant times herein, as set forth more fully below, Ashland had knowledge of the business of CAI and Arnel, the companies' qualifications, their products, the Danvers facility, the relevant manufacturing and chemical storage and mixture methods at the Danvers facility, the location of said facility within a residential neighborhood, the highly explosive nature of the Chemicals and the Chemical

mixtures that it was systematically and continuously providing and maintaining at the Danvers facility, and the foreseeable risks of VCE and massive destruction of the Danversport neighborhood.

9.   Ashland knew, or in the exercise of reasonable diligence should have known, that CAI and Arnel was not properly licensed or permitted for the quantity of flammable and explosive Chemicals used and maintained at the Danvers facility.

10.   Ashland knew, or in the exercise of reasonable diligence should have known, that its Chemicals and Chemical mixtures were being combined, stored and heated in unlawful unventilated tanks and enclosures that were not properly sealed and did not have proper process safety controls including automatic shut-off controls and improperly relied on human oversight, unreasonably subject to inadvertence and error, to avoid the build-up within the facility of solvent vapors that posed an unreasonable risk of a VCE capable of destroying the surrounding residential community .

11.   Ashland knew, or in the exercise of reasonable diligence should have known, that its Chemicals and Chemical mixtures were being combined, stored, and heated in an unsafe environment having foreseeable risks of a high order explosion as a result of human oversight, inadvertence, and error.

12.   Ashland knew, or in the exercise of reasonable diligence should have known, that:

(a).   CAI/Arnel did not have a license to store or use the highly dangerous Chemicals in the quantities being routinely delivered by Ashland and stored and used at the site;

(b).   CAI/Arnel had not obtained and did not have the legally required permits to use or store the highly dangerous Chemicals Ashland was routinely delivering to the site;

(c).     CAI and Arnel did not have an OSHA-mandated Safety Management Program for the safe handling and storage of the flammable and explosive Chemicals Ashland was routinely delivering to the site;

(d).     CAI/Arnel did not have any proper process safety controls including automatic shut-off controls for the safe storage, handling, use and manufacture of the highly dangerous Chemicals Ashland was routinely delivering to the site;

(e).     Ashland's employees routinely assisted CAI/Arnel employees in pumping the highly dangerous Chemicals being routinely delivered by Ashland to the site into large storage/process tanks – tanks capable of holding thousands of gallons of the Chemicals – that were not appropriate to receive, store, or process the Chemicals because:

>    (i).     The tanks allowed heating of the Chemicals without proper safety controls that included automatic shut-off controls but relied solely on human oversight subject to inadvertence and error;

>    (ii).     The tanks did not provide for legally required venting of the Chemical vapors directly from the tank to the outside to prevent the dangerous buildup within the tank of Chemical vapors; and,

>    (iii).     The tanks were not properly sealed to prevent escape of the Chemical vapors from the tank into the building.

(f).     Ashland's employees did not have the proper training or supervision to:

>    (i).     Ensure Ashland's Chemicals were being delivered to facilities that were properly licensed and permitted to receive, store, handle, and use the Chemicals;

>    (ii).     Ensure Ashland's Chemicals were being delivered to facilities that had the OSHA mandated process safety control program regarding the safe handling of the Chemicals;

>    (iii).     Ensure Ashland's Chemicals were being delivered to facilities that had the proper process safety controls regarding the safe handling of the Chemicals;

>    (iv).     Ensure Ashland's employees provided facilities that it was delivering Chemicals to with the proper information, instructions, and warnings regarding the risk of explosion or creation of a VCE from the improper storage, handling, use or manufacture of the Chemicals; and,

    (v).    Ensure that Ashland's employees did not assist facilities that
Ashland's Chemicals were being delivered to in pumping or
otherwise delivering the Chemicals into tanks that were not
lawful to receive such Chemicals because they were not vented to
the outside or were not appropriate to receive, store, or process
such Chemicals because the tanks allowed for uncontrolled
heating, were not vented or properly sealed to prevent the
dangerous build-up of vapors in the tank or in the facility, and/or
did not have proper process safety controls including automatic
shut-off controls but relied solely on human oversight subject to
inadvertence and error.

13.    Ashland knew, or in the exercise of reasonable diligence should have known, that
the Danvers facility was located in a densely-populated residential neighborhood that included
several hundred full-time residents, as well as an active marina housing approximately 100 boats,
and several small business entities.

14.    Ashland knew, or in the exercise of reasonable diligence should have known, that
Heptane (a) is a Class A (highly flammable liquid) within the meaning of 527 C.M.R. 18, having
a flash point of 25° F, (b) shall only be properly pumped or dispensed to enclosures providing
adequate ventilation; (c) is a highly volatile substance susceptible to vapor cloud formation and
explosion by static electricity and various other ignition sources; (d) shall not properly be
handled, drawn or dispensed where flammable vapors may reach a source of ignition; and (e)
should only be stored in a cool, dry, well-ventilated area in tightly sealed containers that are
labeled in accordance with OSHA's Hazard Communication Standard, 29 C.F.R. 1910.1200.

15.    Ashland knew, or in the exercise of reasonable diligence should have known, that
the mixture of Heptane, Iso Propyl and n-P Alcohol in the quantities that it supplied, combined,
and maintained at the Danvers facility had the equivalent explosivity of 4,700 pounds of TNT,
and the foreseeable VCE damage potential within a wide geographical radius of thousands of
feet from the Danvers facility.

16. Ashland's Material Safety Data Sheets, that it prepared and published, and were in effect at the time of the Explosion, failed to adequately disclose the scope and magnitude of Heptanes' explosivity risks and hazards, either individually or in combination with other Chemicals such as Iso-propyl and n-Propyl alcohol including the risk of a VCE from the build-up of vapors from the uncontrolled heating of the Chemicals in improper tanks.

17. Ashland knew, or in the exercise of reasonable diligence should have known, of the risks posed by its products and conduct, but failed to adequately disclose the scope and magnitude of the explosivity of its chemicals and mixtures, and failed to disclose the foreseeable VCE damage potential inherent therein.

18. Ashland knew, or in the exercise of reasonable diligence should have known, that it was failing to adhere to its own published "Responsible Care" principles with respect to its acts and conduct at the Danvers facility, including but not limited to:

   a. "create safe work environments, require compliance and promote environmental stewardship;"

   b. "promote safe and secure operations together with our business community partners;"

   c. "support a zero-incident culture where environmental, healthy, safety and security incidents are preventable;"

   d. Providing products and services that involve minimum risk to people and the environment throughout their life-cycle;"

   e. "use a product risk management process to identify the risks associated with the use of chemicals;"

f.   "create safe and health-conscious work environments, require compliance and embrace environmental stewardship;"

g.   "maintain processes and programs to meet our environmental-, health-, safety- and security-compliance obligations and manage the risks associated with our products."

h.   Ashland, as a member of the National Association of Chemical Distributors ("NACD"), knew, or in the exercise of reasonable diligence should have known that it was failing to comply with the terms of NACD's "Responsible Distribution Process" program, including, but not limited to:

    (i)   developing processes for addressing chemical site and chemical transportation security, to include conducting security vulnerability assessments;

    (ii)   developing processes to qualify customers as prescribed by government regulation; and

    (iii)   working with customers to faster appropriate dissemination of information in the proper use, handling and disposal of products commensurate with product risk.

19.   On the morning of November 21, 2006, Ashland, as part of its above described established routine conduct and practice, set forth above, among other things:

a.   sold, delivered and combined 5,000 to 6,000 gallons of its flammable solvents including delivering and assisting in the making of an explosive mixture of 1,900 gallons of Heptane (1,000 gallons), Iso Propyl (450 gallons) and n-Propyl Alcohol

(450 gallons) in an inappropriate storage/process tank to unlicensed, unpermitted companies at the Danvers facility;

b.      did not inquire or determine whether CAI or Arnel were licensed or permitted for purchasing, storing, combining, using, or maintaining the quantities and types of Chemicals that Ashland provided;

c.      did not inquire or determine whether CAI or Arnel had an OSHA-mandated Process Safety Management Program or any other process safety program or controls for the safe handling and storing of such Chemicals;

d.      failed to comply with, among other things, the safety provisions of 527 C.M.R. 18 and 29 C.F.R. 1910.1200;

e.      failed to disclose the scope and magnitude of the explosivity risks and hazards of the Chemicals and Chemical mixtures that it was providing;

f.      delivered Chemicals into improper, non-conforming and unlawful containers and vessels;

g.      delivered Chemicals into an unsafe environment with foreseeable risks of a devastating VCE and explosion; and

h.      participated in the manufacture of the explosive chemical mixture of 1,000 gallons of Heptane, 450 gallons of Iso Propyl alcohol, and 450 gallons of n-Proply alcohol in a CAI storage/process tank that was not appropriate to receive, store, or process the Chemical mixture that resulted in the VCE that devastated the surrounding community.

20.      On the morning of November 21, 2006, Ashland, as part of its above described established routine conduct and practice, set forth above, worked jointly with CAI personnel at

the Danvers facility to offload Ashland chemicals from Ashland's tanker truck to CAI

storage/process tanks and to produce a highly explosive chemical combination in a CAI

storage/process tank referred to as "Mix Tank 3" that was not appropriate to receive, store, or

process such a Chemical mixture.

21.    By noon on November 21, 2006, between 5,000 and 6,000 gallons of flammable

solvent were offloaded by Ashland and combined by Ashland and CAI personnel, 1,900 gallons

of which was pumped directly from the Ashland Tanker into a CAI storage/process tank referred

to as "Mix Tank 3" – 450 gallons of n-Propyl alcohol, 450 gallons of Iso Propyl alcohol, and

1,000 gallons of Heptane. "Mix Tank 3" was not appropriate to receive, store, or process such a

Chemical mixture. "Mix Tank 3" was not appropriate to receive, store, or process such a

Chemical mixture because:

> (i).    The tank allowed heating of the Chemicals without proper safety
> controls that included automatic shut-off controls but relied solely
> on human oversight subject to inadvertence and error;
>
> (ii).   The tank did not provide for legally required venting of the Chemical
> vapors directly from the tank to the outside to prevent the dangerous
> buildup within the tank of Chemical vapors; and,
>
> (iii).  The tank was not properly sealed to prevent escape of the
> Chemical vapors from the tank into the building.

The highly volatile and explosive combination of the Chemical mixture in such an inappropriate

tank resulted, within hours, in a solvent vapor cloud formation of Heptane and Iso Propyl and n-

Propyl Alcohol within the facility that resulted in the VCE and the occurrence of the Explosion

that devastated the Danversport community.

22.    The Explosion occurred at approximately 2:46 a.m. on November 22, 2006 at the

Danvers facility. The Explosion destroyed the Danvers facility and caused over $30 million in

damage to the surrounding Danversport residential and business community. Plaintiffs suffered

substantial injury and damage as a result.

23.     Subsequent investigations of the Explosion by both the Massachusetts State Fire

Marshall's Office and the U.S. Chemical Safety Board have determined that the Explosion was

the result of a confined solvent VCE.  These State and Federal authorities concluded, among

other things, that the vapor build-up that caused the VCE and the Explosion was created by the

Heptane and Alcohol vapors from the aforementioned CAI "Mix Tank 3". The explosive vapors

filled the confined space of the Danvers facility and reached an undetermined ignition source and

exploded, thus causing the subject Explosion that destroyed the surrounding community, thus

causing substantial injury and damage to Plaintiffs.

24.     On the reverse side of Ashland's invoices for the chemicals that were involved in

the Explosion, was the statement:

Sales Terms and Conditions

...

9.      BUYER agrees to defend, indemnify and hold SELLER harmless against claims
        by any third party (including BUYER's employees and customers) arising out of
        BUYER's use, storage, handling or resale of the Product.

Ashland Invoices at **Exhibit A**.

## V.      SETTLEMENT OF PLAINTIFFS' CLAIMS WITH CAI/ARNEL

24.     The Plaintiffs and CAI/Arnel reached a settlement of the Plaintiffs' claims against

CAI and Arnell that was approved by the Essex County Superior Court on October 22, 2008 in

*Borelli et al v. CAI et al*, Essex County Sup. Crt. CA No. 06-2382 (*Borelli*).

25.     Pursuant to the release in the *Borelli* settlement agreement, the Plaintiffs agreed,

among other things, to release all claims against CAI arising out of the explosion. The

settlement agreement also contained an indemnification provision that provides:

> Each individual member of the Subrogated Group and Trust [all trust beneficiaries and representatives] (collectively, the 'Indemnitors') agrees to defend, hold harmless and indemnify each of the Released Parties from any and all claims in the nature of third-party claims for indemnity or contribution which might be brought by Non-Released Parties against whom actions are brought by any individual Indemnitor(s) to the extent that any such individual Indemnitor(s) initiated (or subsequently joined in) the litigation or claim against the Non-Released Party which, in turn, caused the contribution or indemnity claim to be brought against the Released Party.

*See* Section 5 of *Borelli* Stipulation of Class Action Settlement and Release, and Section 6 of the *Borelli* "Global Settlement Agreement", attached at **Exhibit B**.

26.     Pursuant to the *Borelli* settlement agreement CAI/Arnel's insurers paid

$7,000,000 into an interest bearing escrow account of which $1,475,000 was distributed to the

*Borelli* class members and the Trust, and the remaining $5,525,000 was paid to the Subrogated

Group of insurers who had paid casualty claims to many of the Plaintiffs and other members of

the community impacted by the explosion. A Claims Review Committee was then established by

the *Borelli* court to determine, on a case-by-case basis, which members of the *Borelli* class

would share in the settlement funds and to calculate the pro rata dollar amount that each claimant

would receive. The Claims Review Committee reviewed approximately 250 claim forms

submitted by *Borelli* class members for property damages, business revenue loss, relocation

costs, personal injury and/or emotional distress resulting from the Explosion and distributed the

funds.

## VI.     *RIVA* CLASS ACTION

27.     On November 16, 2009, a class action was filed against Ashland in *Riva et al v. Ashland*, D.Mass. CA No. 09-12074-DJC (*Riva*). The *Riva* action was on behalf of three named parties and the proposed Class of all persons and entities (including but not limited to all

Plaintiffs named in this case) injured or damaged by the Explosion. The *Riva* action sought to recover monetary damages from Ashland to compensate the named parties and the Class for losses caused by Ashland's conduct in causing the explosion. The *Riva* action asserted claims against Ashland for strict liability, negligence, public nuisance, breach of warranty of merchantability and MGL c.93A. Ashland filed a third-party complaint against C.A.I. on April 14, 2010, asserting claims for, among other things, contractual indemnity and contribution. Ashland in its third-party claim against CAI also requested declaratory judgment regarding its entitlement to indemnity and contribution from CAI. In its answer, C.A.I. submitted a counterclaim against the *Riva* parties for contractual indemnification.

28.     On December 13, 2011, the *Riva* court denied the *Riva* plaintiffs' motion for class certification.

## VII.    CAUSES OF ACTION

29.     Plaintiffs seek recovery against Ashland pursuant to the following causes of action that arise *solely* out of Ashland's conduct. Plaintiffs are not seeking recovery from Ashland based on causes of action for "claims arising out of [CAI's] use, storage, handling or resale of the Product." Accordingly, Plaintiffs under these causes of action seek recovery from Ashland to the extent that Ashland is not entitled to seek recovery from CAI under the claim for indemnity or contribution at issue.

## COUNT I

### (Strict Liability)

30.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this Complaint.

31.     Ashland's conduct, undertakings and activities were so fraught with peril to the Danversport neighborhood that it should not have been permitted to adopt or engage in them for its own purposes without protecting the neighbors from the injury or loss by reason thereof.

32.     Ashland engaged in such unusual and extremely dangerous undertakings and activities that it must be deemed to have been done at its own risk.

33.     Alternatively, Ashland's provision, mixture, storage, and maintenance of large quantities of highly explosive materials as set forth above constituted ultra-hazardous or abnormally dangerous activities.

34.     Ashland's extremely dangerous and/or ultra-hazardous activities proximately caused injury and damages to Plaintiffs.

35.     Ashland is strictly liable for the injury and damages caused to Plaintiffs.

## COUNT II
### (Negligence)

36.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this Complaint.

37.     Ashland, at all material times, owed a duty of due care to Plaintiffs as persons who were reasonably foreseeable to be adversely affected by chemical explosions at the 126 Water Street, Danvers, Massachusetts manufacturing facility.

38.     The injury and damages suffered by Plaintiffs were proximately caused by Ashland's negligent breach of its duties, including but not limited to, Ashland's:

   a.     Failure to inquire or determine that CAI and/or Arnel were licensed or permitted for using, storing, and handling flammable and explosive substances;

   b.     Failing to inquire or determine that CAI and/or Arnel had an OSHA-mandated Process Safety Management Program or any proper process safety control

{00026960.DOCX ; 1}15

program for the safe use, storage and handling of flammable and explosive Chemicals;

c. Participating in the combination, production, and/or manufacture of highly explosive Chemical mixtures;

d. Providing, combining and maintaining volatile Chemicals and explosive Chemical mixtures in an unsafe environment, with the foreseeable risk of a VCE explosion due to human inadvertence and error;

e. Failing to disclose or otherwise provide appropriate or adequate information in the form of warnings or instructions regarding the inherent risk of explosion and VCE explosion risk from use of Ashland's products alone or in combination without appropriate process safety controls to avoid such risk;

f. Failing to inquire or determine whether CAI and/or Arnel had appropriate or adequate process safety controls to remove the risk of explosion and VCE risk in light of Ashland's knowledge that explosive products and mixtures were being stored in large quantities in an enclosed space and processed in high volume heated, unsealed, unvented containers without appropriate process safety controls such as automatic shut offs and that were subject to human inadvertence and error;

g. Ignoring or failing to utilize methods to assess the magnitude of the foreseeable explosion and VCE risk posed to the community by the use, handling and storage of Ashland's Chemical products;

h. Failing to make reasonable inquiry or determination regarding whether CAI and/or Arnel were using Ashland's products in a safe and legal manner, to provide

adequate information concerning the explosion and VCE risks they posed to the

community, or to properly assess Ashland's adherence to its own published safety

standards and principles set forth in its so-called Responsible Care Program.

## COUNT III
### (Public Nuisance)

39.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this

Complaint.

40.     Ashland's conduct as set forth above constituted substantial contribution to, and

participation in, the creation and maintenance of a public nuisance.

41.     Plaintiffs commonly suffered injury and damages proximately caused by the

public nuisance created and maintained by Ashland.

42.     Ashland participated in creating and maintaining a public nuisance by, among

other things:

a.     Continuously and systematically supplying, maintaining, combining, and

replenishing large volumes of explosive Chemicals to a location within a densely

populated residential neighborhood; and

b.     Supplying, maintaining, combining, and replenishing large volumes of explosive

Chemicals for unlicensed and unpermitted users in an unsafe environment that

continuously exposed the surrounding neighborhood to a VCE explosion and

catastrophic loss.

## COUNT IV
### (Breach of Warranty of Merchantability)

43.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this

Complaint.

44.     Ashland's unlawful supply of Chemicals and its combination of manufacture of the Heptane/alcohol mixture was not merchantable and was unreasonably dangerous for its intended purpose.

45.     Plaintiffs were among the persons that Ashland knew or reasonably should have known may be affected by the goods that it was providing and assisting CAI in making.

46.     Ashland's unlawful supply of Chemicals and its assisting in the combination and manufacture of the Heptane/alcohol mixture in an inappropriate storage/process tank was not merchantable as a dilutent for resin for ink manufacturing located in a densely populated Danversport residential neighborhood, in at least the following material respects:

a.     the uncontrolled process required heating Heptane with other low boiling point solvents (Isopropyl and n-Proply alcohol) in a confined space in an unsealed container that was not vented to the outside and that allowed for the such heating to take place without proper process safety controls such as automatic shutoffs and was subject to human inadvertence and error creating and exacerbating the peril of a VCE;

b.     the Heptane/alcohol mixture in such an inappropriate container created a low boiling point explosive mixture that substantially increased the VCE and corresponding explosion risk to the community;

c.     the Heptane/alcohol products did not come with warnings and instructions regarding the process controls to substantially reduce or remove the inherently dangerous explosive nature of the products and reduce the threat to the community of a VCE when used either separately or in combination in such an inappropriate container.

47.     Ashland's breaches of the implied warranty of merchantability proximately caused

Plaintiffs to suffer substantial injury and damages.

**COUNT V**
**(Violation of M.G.L. Chapter 93A)**

48.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this

Complaint.

49.     This Cause of Action is brought pursuant to the Massachusetts Consumer

Protection Act, M.G.L. c. 93A, §9 ("Chapter 93A").

50.     The above-referenced conduct of Ashland constitutes unfair and deceptive trade

practices within the meaning of Chapter 93A.

51.     A written demand for relief was served on Ashland before the filing of the *Riva*

action by the *Riva* plaintiffs on behalf of themselves and all other persons similarly situated to

the *Riva* plaintiffs including the Plaintiffs.  The demand contained a reasonable description of

the unfair and deceptive conduct complained of and the injury and damage caused by Ashland's

conduct that caused the Explosion.  Ashland failed and refused to grant the relief demanded or

make a reasonable offer of settlement despite the fact that the use or employment of the act or

practice complained of was a willful or knowing violation of section two MGL c.93A and the

refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that

the act or practice complained of violated section two of MGL c.93A.

52.     Ashland's conduct was willfully and knowingly unfair and deceptive and its

failure and refusal to grant the relief or make a reasonable offer to settle the matter in resppnse to

the written demand entitles Plaintiffs to double or treble damages as provided by MGL c.93A.

## VIII. REQUEST FOR DECLARATORY RELIEF

53.     Plaintiffs repeat and reallege each of the paragraphs set forth above in this Complaint.

54.     The Declaratory Relief requested by the Plaintiffs involves a genuine case or controversy between Plaintiffs and Ashland. The history of the *Riva* action has demonstrated Ashland's inclination to file a third party claim for indemnity and contribution against CAI in response to an action to hold Ashland accountable for the injury and damage caused by Ashland's, as opposed to CAI's, conduct that caused the Explosion. That history has also demonstrated CAI's inclination in response to such a third party claim to file a counter-claim against the parties bringing an action against Ashland.

55.     The history of the course of conduct in *Riva* by Ashland and CAI regarding the filing of a third party claim and counter-claim in response to an action being brought against Ashland for the type of conduct complained of in this action provides substantial reason to believe that the same course of conduct will be undertaken here.

56.     Because Plaintiffs' action by its terms only seeks recovery from Ashland to the extent that Ashland is not entitled to seek recovery from CAI under the claim for indemnity or contribution at issue, and in order to ensure the just, fair, and efficient resolution of this action, Plaintiffs' request that: this Court determine at the threshold whether or not, based on the claims being asserted by Plaintiffs against Ashland, there is a legal basis for Ashland to seek recovery from CAI on the claim for indemnity or contribution at issue.

## IX. DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request the Court grant the following relief:

1.      Determine at the threshold the issue of whether or not, based on the claims being asserted by Plaintiffs against Ashland, there is a legal basis for Ashland to seek recovery from CAI on the claim for indemnity or contribution at issue.

2.      Grant Judgment for Plaintiffs against Ashland and award monetary damages to Plaintiffs to the extent that Ashland is not entitled to recover against CAI on the claim for indemnity or contribution at issue;

3.      Based on the extent of the relief requested in sub-paragraph 2 above, grant Judgment for Plaintiffs against Ashland for double or treble damages, attorneys' fees, costs and expenses as provided for by MGL 93A; and,

4.      Grant such other and further relief as this Court deems just and proper.

## X.      JURY DEMAND

The Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  December 19, 2010

Respectfully submitted by their attorneys,

/s/ Peter A. Lagorio
    Law Office of Peter A. Lagorio
    63 Atlantic Avenue
    Boston, MA 02110
    617-367-4200

/s/ Michael F. Germano
    Germano Law Offices LLC
    63 Atlantic Avenue
    Boston, MA 02110
    617-367-5911

Counsel for Plaintiffs